USTRUST & another[1] *vs.* HENLEY & WARREN
MANAGEMENT, INC.[2]

No. 94-P-803.

Suffolk. January 11, 1996. - April 25, 1996.

Present: ARMSTRONG, KASS, & LENK, JJ.

*Evidence,* Extrinsic affecting writing, Parol evidence. *Contract,* Construction of contract. *Practice, Civil,* Summary judgment, Vacation of judgment. *Fraud. Consumer Protection Act,* Unfair or deceptive act.

The express provisions of a commercial finance agreement demonstrated that it was a complete and fully integrated agreement and there was no evidence that the execution and delivery of the contract were induced by fraud; as a result, the terms of the agreement could not be varied or supplemented by parol evidence. [340-343]

Summary judgment was correctly entered for a defendant bank on a claim of violation of G. L. c. 93A, related to a commercial loan, where there was no evidence of deceptive conduct. [343]

A Superior Court judge properly exercised his discretion to deny civil plaintiffs' motion to vacate judgment. [343-344]

CIVIL ACTION commenced in the Superior Court Department on March 11, 1992.

The case was heard by *Gordon L. Doerfer,* J., on a motion for summary judgment, and a motion for relief from judgment was heard by him.

*Lawrence J. Cohen* for the defendant.

*Dustin F. Hecker* for the plaintiffs.

KASS, J. Although the defendant has, with its appeal, served up a six-volume record that describes a moderately complex financial "workout" transaction, at bottom the question is whether a prior conversation about the terms of the workout can vary or amplify the terms contained in detailed

[1]Norfolk Holdings Corp.

[2]In its capacity as general partner of Warren Street Associates Limited Partnership.

written instruments negotiated with the assistance of counsel. A judge of the Superior Court thought not, and we affirm.

We first sketch the facts of the workout to give an introduction to the business context of the case. Thereafter, we shall describe with more precision the terms of the workout and the important provision that the defendant says was omitted from the governing documents.

Tontine Crescent Associates, Inc. (Tontine), in 1986 had undertaken the development of a residential condominium complex, together with some garage and office space, in Charlestown. To do so, it had borrowed $9,200,000 from US-Trust,[3] secured by a first mortgage. By June, 1990, Tontine had become financially distressed and lapsed into default on its mortgage, on which $3,125,646 of unpaid principal and accrued interest was due.[4]

Lender and borrower[5] applied themselves to a "workout," culminating in the execution on August 22 and 23, 1990, of a detailed settlement agreement, to which thirteen exhibits totalling more than 146 pages were appended.[6] Among many other things, the settlement — or workout — agreement required that the owner of the garage parcel (of which more will be said below) pay past due and current real estate taxes. This the owner failed to do, provoking a new default and this action against Henley & Warren Management, Inc., the general partner of Warren Street Associates Limited Partnership, asking for a judgment in the amount of the unpaid balance of the loan, plus other relief. The defendant's response, by way of counterclaim, was that James R. Adams, a principal in Tontine, and Quinlan Sullivan, a former president of the bank, had lunched together to talk about the basis of a workout and that at the lunch meeting Sullivan had promised

---

[3]At the time of the mortgage loan, USTrust was called USTrust/Norfolk. Norfolk Holdings Corp., a coplaintiff, is a wholly owned subsidiary of US-Trust. To simplify the narrative, we shall refer collectively to the plaintiffs in the action, USTrust and Norfolk Holdings Corp., as "the bank" or as USTrust.

[4]That amount included $700,000 loaned to Robert Fox, a player in the Tontine venture and a guarantor of the Tontine mortgage note.

[5]As well as James R. Adams, a principal in the Tontine development.

[6]There were 146 pages of appended documentation in the record-appendix but not all the exhibits were included.

that USTrust would make an additional loan of the money needed to pay the taxes.[7]

The bank successfully moved for summary judgment against Warren Street Associates Limited Partnership[8] on its counterclaim. A judge of the Superior Court ruled that the settlement agreement was fully integrated and could not be varied or supplemented by the earlier lunch time conversation. Accordingly, a final judgment was entered[9] in favor of the bank on the counterclaim. There was a timely appeal by the defendant, followed by a lengthy effort to reopen the counterclaim aspect of the case through a motion for relief from judgment. That motion was denied and from that the defendant also appealed.

What we have referred to as the "garage parcel" was a commercial garage located at 34-42 Warren Street and 16-20 Henley Street in Charlestown. It had, at the time of the workout agreement, been renovated — at least in part — as office space. As called for by the workout agreement, the parties formed the Warren Street Associates Limited Partnership (WSALP), Tontine conveyed the garage parcel to WSALP,

---

[7] That was just a part of the over-all five-point workout plan said by Adams to have been worked out at the lunch meeting. The five points were as follows:

1. The garage parcel would secure a five-year note for $625,000. No payments would be due for two years. Interest would accrue at the rate of eight per cent (8%) for the last three years of the note.

2. USTrust would advance approximately $75,000 to pay all back taxes. The advance would be added to the amount owed USTrust.

3. Henley & Warren would manage the garage parcel pursuant to a USTrust approved management agreement. From the income generated by the garage, Henley & Warren would pay current expenses. In return, Henley & Warren would retain any surplus receipts for two years as its own income.

4. The parties would form a nominee trust. The beneficial owner would be a limited partnership. The partners would be USTrust, a 32.5% interest, and Adams, a 67.5% interest.

5. USTrust would take title to seventeen remaining condominium units and eighteen outdoor parking spaces.

[8] Quite properly, the motion ran against Henley & Warren Management, Inc., in its capacity as general partner of Warren Street Associates Limited Partnership.

[9] Although the relief sought by the plaintiffs was still an open question, the judge expressly determined that there was no just reason for delay in the entry of a final judgment on the counterclaim. See Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974).

and WSALP agreed to perform all the obligations of the mortgagor (Tontine) under the mortgage regarding the garage parcel. Section 2.3 of the workout agreement provided:

> "The Limited Partnership will assume and agree to pay all outstanding real estate taxes assessed against the Garage and the Garage Parcel, and the other outstanding bills and charges pertaining to the Garage set forth in Exhibit H."

Tontine, Adams, and a related management company (Henley & Warren), of which Adams was the principal officer, owned a 67.5 per cent interest in the limited partnership. The balance was owned by Norfolk Holdings, Inc., a subsidiary of the bank. In the governing mortgage documents, there was the usual provision requiring the borrower to keep current real estate taxes and other public charges.

WSALP concedes the obligation to pay the taxes but says the understanding between Adams and Sullivan had been that the bank would provide the money for the taxes and that the loan would be increased in the amount of the additional money advanced. This must have been the intent of the parties, WSALP argues blithely, because surely the bank knew WSALP was strapped for funds. Unhappily for WSALP, the workout agreement contains provisions stating expressly what additional amounts the bank is to advance, e.g., for taxes and association fees on unsold condominium units, and is conspicuously silent about advancing money for taxes on the garage parcel. See *Bendetson* v. *Coolidge*, 7 Mass. App. Ct. 798, 801-802 (1979).

The possibility of conversations along the way was not ignored in the workout agreement. Sections 5.4 and 5.5 contained the following:

> "5.4. Borrower and Adams each acknowledge that they have thoroughly read and reviewed the terms of this Agreement and the Exhibits attached hereto and are familiar with the terms of this Agreement, that the terms and provisions contained herein have been fully and unconditionally consented to by them, and that they have had the full benefit and advice of counsel of their own selection . . . and that their execution of this

Agreement and of the documents executed in connection herewith is done freely, voluntarily, with full knowledge, and without duress, and that in executing this Agreement Borrower and Adams are relying on no other representations either written or oral, express or implied, made to either of them by any other party hereto, and that the consideration received by it hereunder has been actual and adequate."

"5.5. Lender, Borrower and Adams each acknowledge that there are no other agreements or representations, either oral or written, express or implied, that are not embodied in this Agreement, and this Agreement, the Exhibits attached hereto, and the documents executed in connection herewith, represent a complete integration of all the prior and contemporaneous agreements and understandings of the parties."

Further expression of the same intent of the parties appeared in paragraph 8(c) of the management agreement under which Henley & Warren undertook to manage the garage parcel for the benefit of the limited partnership. That paragraph said:

"8(c) This Agreement shall supersede all prior agreements between the parties relating to all or any part of the subject matter of this Agreement and constitute the agreement of the parties relating to such subject matter, and there are no written or oral terms or representations made by either party relating to such subject matter other than those contained in this Agreement."

It is difficult to imagine how the parties could have expressed themselves more forcefully that the settlement agreement, and the thirteen exhibits strapped to it, constituted an integrated agreement, not to be varied by prior conversation. There is no need to reflect either on the rule that parol evidence will not be received to vary fully integrated written agreements subsequently executed, *New England Financial Resources, Inc.* v. *Coulouras*, 30 Mass. App. Ct. 140, 145 (1991), or to divine the intention of the parties on the question of integration. See *Antonellis* v. *Northgate Constr. Corp.*, 362 Mass. 847, 849 (1973); *Wang Labs., Inc.* v. *Docktor Pet Centers, Inc.*, 12 Mass. App. Ct. 213, 219 (1981).

Of course, "[t]he integrated documents barrier may be penetrated by evidence tending to show that the documents are not, in fact complete, [citation omitted], or that the execution and delivery of the documents were induced by fraud." *Hogan* v. *Riemer,* 35 Mass. App. Ct. 360, 364-365 (1993). See also *Bates* v. *Southgate,* 308 Mass. 170, 182 (1941); *McEvoy Travel Bureau, Inc.* v. *Norton Co.,* 408 Mass. 704, 711 n.5 (1990). Here, the language of integration and the express disavowal of recourse to prior discussion precludes the argument that the documents are incomplete because they do not include a provision said to have been previously discussed. Assuming, favorably to WSALP, that there had been an inadvertent omission of the bank's agreement to lend additional funds to pay for taxes, it was the responsibility of the borrower, which has not disclaimed having had the advice of competent counsel, to read the documents and remedy the omission before signing off on the papers.

As to fraud in the inducement, that means in this context that the contents of the settlement documents or their significance had been misrepresented prior to or at the time of closing. *Hogan* v. *Riemer,* 35 Mass. App. Ct. at 365. Compare *McEvoy Travel Bureau, Inc.* v. *Norton Co.,* 408 Mass. at 708, in which the defendant said that a termination clause in a written agreement it had proffered was " 'inoperative' and 'meaningless,' a mere technicality that [the defendant's] law department had required." There is no evidence of the bank having misrepresented the content of the settlement agreement papers, suggesting that any provision in them should be ignored, or of Adams having raised any question about an element not merely missing from the settlement agreement but inconsistent with it.

WSALP makes no headway with the argument that clauses in the mortgage documents reserving the right to the bank, at its option, to pay taxes of the borrower constitute evidence of an *obligation* to advance money for taxes. Once again, Tontine is in the awkward position of having to strip language of all meaning.

To be sure, no form of words is self-interpreting, *Antonellis* v. *Northgate Constr. Corp.,* 362 Mass. at 851, and fact bound questions about the contextual sense of documents and about fraud are infrequently good candidates for disposition on a motion for summary judgment. See, e.g., *New England*

*Financial Resources, Inc.* v. *Coulouras,* 30 Mass. App. Ct. at 146-147. Cf. *Madden* v. *Estin,* 28 Mass. App. Ct. 392, 395 (1990). That does not mean, however, as WSALP would have it, that questions of interpretation, integration, and fraud are always invulnerable to a well-supported motion for summary judgment. Claims of ambiguity and fraud do not hold the line against summary judgment if the documents do not reflect ambiguity on the point in question, and the party resisting summary judgment adduces no evidence of ambiguity or fraud. See *Kourouvacilis* v. *General Motors Corp.,* 410 Mass. 706, 716 (1991); 10A Wright, Miller & Kane, Federal Practice & Procedure § 2730.1, at 279-282 (2d ed. 1983). What a party remembers about what was said at a business conference is easily colored by what that person wished to be resolved by the discussion. The hoped for result metamorphoses into fact. That is why lawyers draw commercial instruments to state as precisely as they can the rights and duties of the parties, and that is why the parties sign those agreements. A judge uses summary judgment for the purpose for which it was intended when, as in this case, a party seeks to alter what the agreement provides by saying, in effect, "that was not what we meant at all." Cf. *Boston Edison Co.* v. *Federal Energy Regulatory Commn.,* 856 F.2d 361, 367 (1st Cir. 1988).

WSALP's complaint of unfair and deceptive conduct by the bank, actionable under c. 93A, fails with the failure of the materials on summary judgment to include any evidence that the bank misrepresented the content of the closing documents or that it hornswoggled Adams into signing them on behalf of Tontine and WSALP. Whether the bank's first notice to WSALP of default, based on violation of a clause against junior encumbrances, was opportunistic and unfair because USTrust had known the junior encumbrance would occur is not a point WSALP has pressed on appeal. In any event, the ultimate ground for the commencement of foreclosure proceedings against WSLAP was the failure to pay past due real estate taxes on the garage parcel.

WSALP moved to vacate judgment under Mass.R.Civ.P. 60(b)(3), 365 Mass. 828 (1974), on the ground that the bank had allegedly fraudulently withheld significant documents during the discovery phase of the proceedings. The trial judge examined the documents and, in a written memorandum,

found that they contained no relevant information bearing on the status or meaning of the settlement agreement or alleged fraudulent acts by the bank. In exercising his discretion on the rule 60(b) motion, the judge properly considered whether WSALP had a realistic prospect of success in the claim it sought to revive. *Berube* v. *McKesson Wine & Spirits Co.*, 7 Mass. App. Ct. 426, 430 (1979). There was no abuse of discretion by the judge. *Id.* at 433-434.

*Judgment affirmed.*

*Order denying motion to vacate judgment affirmed.*